UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X

NUBIA BENOIT,                          :

            Plaintiff,        :

                     :

  -against-                            :

                     :

METROPOLITAN TRANSPORTATION            :
AUTHORITY,                             :

             Defendant.        :

------------------------------ X

```
┌────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____      │
│ DATE FILED: 11/21/2016          │
└────────────────────────────────┘
```

No. 15 Civ. 6095(JFK)
**OPINION & ORDER**

APPEARANCES
FOR PLAINTIFF NUBIA BENOIT
     Frederic M. Gold, Esq.
     FREDERIC M. GOLD, PC

FOR DEFENDANT METROPOLITAN TRANSPORTATION AUTHORITY
     Helene Rachel Hechtkopf, Esq.
     Miriam Jerry Manber, Esq.
     HOGUET NEWMAN REGAL & KENNEY, LLP

**JOHN F. KEENAN, United States District Judge:**

     Defendant Metropolitan Transportation Authority ("MTA")
moves the Court to grant it summary judgment in Plaintiff Nubia
Benoit's ("Benoit") Federal Employer's Liability Act ("FELA")
claim for a work-related injury suffered on September 13, 2014,
to her right arm, neck, and back.  The Court grants the MTA's
motion in part and denies it in part because a reasonable jury
could conclude that certain aspects of the MTA's negligence
played some part in Benoit's injury based on the summary
judgment record.

1

**I.  Background**[1]

A.  <u>The Parties</u>

The MTA is a public benefit corporation created under N.Y. Public Authorities Law § 1263, and the MTA Police Department ("MTAPD") is a branch of the MTA created by statute. (Def.'s Loc. R. 56.1 Statement ¶¶ 3-4.)  The MTAPD maintains its own pension plan as part of the MTA's Defined Benefits Pension Plan. (<u>Id.</u> ¶ 52.)

Benoit is an MTAPD officer who joined the MTAPD in 2000. (<u>Id.</u> ¶¶ 1-2.)  The MTAPD has stationed Benoit at the Atlantic Terminal in Brooklyn, New York, for nearly her entire career. (<u>Id.</u> ¶ 11.)  Benoit's job duties at the Atlantic Terminal require her to keep the area safe for passengers, which includes removing people, like the homeless, who do not belong there. (<u>Id.</u> ¶ 12.)

Before joining the MTAPD, Benoit worked as a New York Police Department ("NYPD") patrol officer for two years, where she received nine months of training, including "safety tactics" training designed to educate her on how to defend herself in a variety of situations. (<u>Id.</u> ¶¶ 5-6.)  As an NYPD officer, Benoit made approximately four arrests per month. (<u>Id.</u> ¶ 7.)

---

[1]  The summary of facts draws from the parties' Local Rule 56.1 statements, which, unless noted, do not contradict one another.

When she joined the MTAPD, Benoit participated in a ten-week training program, where she received an MTAPD police officer job description that explained that MTAPD officers must perform actions that require physical force including subduing persons resisting arrest, disarming violent armed suspects, and breaking up fights. (Id. ¶¶ 8-10, 13.)  Benoit also received an MTAPD patrol manual that included guidelines on how to conduct arrests, the appropriate use of force, and how to deal with persons needing aid and emotionally disturbed persons. (Id. ¶ 14.)[2]  Over her MTAPD career, Benoit has made approximately six or seven arrests and experienced individuals who resisted arrest. (Id. ¶¶ 15-16.)

### B.   The Incident

On September 13, 2014, Benoit was scheduled for the 7:00 a.m. to 7:20 p.m. shift at the "3-Ida" post at Atlantic Terminal with her partner Michael Benjamin ("Benjamin"). (Id. ¶¶ 17-19.)  The 3-Ida post covers all of Atlantic Terminal including its platforms, the waiting room, the upper and lower mezzanines, and the sidewalk outside the terminal. (Id. ¶ 20.)

---

[2]  Benoit admits these facts, but adds, with citation only to her own deposition testimony, that MTAPD officers "needed more hands-on training in dealing with violent individuals since the computer or video training offered was not as helpful as hands-on training." (Pl.'s Loc. R. 56.1 Statement ¶ 71.)

3

The MTAPD shares jurisdiction over the public sidewalk outside the Atlantic Terminal with the NYPD's 78th precinct. (Id. ¶ 21.)

Benjamin, who stands six feet four inches tall, has no disciplinary history and received the same MTAPD training as Benoit. (Id. ¶¶ 53-55; Pl.'s Loc. R. 56.1 Statement ¶ 59.)[3]

The MTAPD Sergeant on duty is responsible for staffing the posts at Atlantic Terminal, taking into account the seniority level of the officers on duty. (Def.'s Loc. R. 56.1 Statement ¶¶ 56-57.)  Generally, there are two to three officers assigned to the 3-Ida post and, often, a sergeant is posted there as well. (Id. ¶ 58.)[4]

At the start of her shift, Benoit equipped herself with all necessary gear, which she had been trained to use, and ensured it was in working order. (Id. ¶ 22.)  Some time during their patrol, Benoit and Benjamin encountered a homeless man named

---

[3]  In her brief in opposition to the MTA's motion to dismiss (but not her Local Rule 56.1 Statement), Benoit cites her testimony that "it was 'widely known throughout the Department that Officer Benjamin would fail to step up to aid a partner in trouble'" and that Benoit named "at least one supervisor with personal knowledge of this tendency." (See Mem. of L. in Opp'n to Def.'s Mot. for Summ. J. 8, ECF No. 19 [hereinafter Opp'n] (citing Benoit Dep. 41:10-44:17, Mar. 3, 2016; Benoit Aff. in Opp'n to Mot. for Summ. J., ECF No. 22).)

[4]  Benoit admits these facts, but adds, with citation only to her own deposition testimony, that the MTA has known for years, since at least 2004, that Atlantic Terminal is understaffed and that, with the opening of Barclays Center, the demand for more police officers has increased. (Pl.'s Loc. R. 56.1 Statement ¶¶ 69-70.)

Arturo Mendez speaking loudly, cursing, and giving Benjamin the
finger. (Id. ¶ 25.)  Benoit and Benjamin knew Mendez, with whom
they had previously had courteous, nonviolent, and
nonconfrontational encounters, and Benoit described his behavior
at this time to be "out of his normal character." (Id. ¶¶ 23-
24.)  Mendez is slightly taller than Benoit, who stands five
feet seven inches tall. (Pl.'s Loc. R. 56.1 Statement ¶ 60.)
Benoit and Benjamin approached Mendez, and Benoit said, "You
cannot behave like that in here.  You need to exit." (Def.'s
Loc. R. 56.1 Statement ¶ 26.)  Mendez refused to leave, and
Benoit responded, "Listen, you know, you're not supposed to be
in here.  You're acting in a manner that is going to cause
public alarm.  You need to leave." (Id. ¶ 27.)  Mendez then left
Atlantic Terminal. (Id. ¶ 28.)

Twenty or thirty minutes later, Mendez returned to Atlantic
Terminal and resumed yelling, screaming, and cursing. (Id.)
Benoit and Benjamin escorted Mendez outside to the Flatbush
Avenue sidewalk, where he continued cursing at them and stuck
his finger in Benjamin's face. (Id. ¶¶ 29-30.)  Benjamin grabbed
Mendez's left hand and slammed him against a wall, holding him
there. (Id. ¶¶ 30-31.)

With Benjamin holding Mendez against the wall, Benoit
cuffed Mendez's right hand. (Id. ¶ 31.)  Benjamin held Mendez's
left hand, but Mendez twisted his body and flailed his arms and

successfully avoided being fully cuffed. (Id. ¶¶ 31-32.)  Benoit

attempted to subdue Mendez with her mace spray, but the wind

blew the mace back into her and Benjamin's eyes. (Id. ¶ 33.)

Benoit then struck Mendez with her baton and instructed him to

stop resisting arrest. (Id. ¶ 34.)  Benjamin did not use his

mace spray or baton. (Pl.'s Loc. R. 56.1 Statement ¶ 61.)

Benoit asked Benjamin for more help, but Benjamin did not do

anything beyond restraining Mendez's left arm. (Id. ¶¶ 62-64.)

Incapable of cuffing Mendez herself from the standing position,

Benoit took Mendez to the ground. (Id. ¶ 66; Def.'s Loc. R. 56.1

Statement ¶ 36.)  Now on the ground, Benoit pinned Mendez with

her knee to his back, and she (and possibly Benjamin) finally

handcuffed him. (Def.'s Loc. R. 56.1 Statement ¶ 35-36.)[5]  After

the incident, an NYPD officer who had been inside the Atlantic

Terminal mall approached the scene. (Id. ¶ 37.)  There were no

other officers in the vicinity. (Pl.'s Loc. R. 56.1 Statement

¶ 65.)

## C.  Post-incident Treatment

After arresting Mendez, Benoit felt pain in her right arm.

(Def.'s Loc. R. 56.1 Statement ¶ 38.)  She telephoned her

supervisor, Sergeant George Thomson ("Thomson"), to advise him

---

[5]  Benoit disputes that she and Benjamin cuffed Mendez together
and asserts that she cuffed him by herself. (See Pl.'s Loc. R.
56.1 Statement ¶¶ 34, 67.)

that she had been injured and then she accompanied Mendez in an ambulance to New York Methodist Hospital. (Id. ¶ 39.)  Thomson met Benoit there. (Id.)  The hospital treated Benoit for pain to her right forearm and released her. (Id. ¶ 40.)

Later that night, Thomson filled out an incident report based on information reported by Benoit. (Id. ¶ 41.)  Thomson's incident report stated that Benoit received medical attention for "swelling/bruising/minor abrasions around her right forearm," and that the attending physician advised her to seek further care from a private physician if necessary. (Id. ¶ 42.)  Thomson's incident report also stated that he completed a "Workers' Compensation package" for Benoit. (Id. ¶ 43.)

That same night, Benoit completed a Service-Related Injury Report, which stated that she suffered "pain, swelling and a burning sensation" in her right arm. (Id. ¶ 44.)  Benoit also completed a Use of Force form, which is required whenever an MTAPD officer uses force. (Id. ¶ 45.)  Benoit's Use of Force form stated that both she and Benjamin used force to subdue and handcuff Mendez. (Id. ¶ 46.)

The next morning, Benoit started to complain of back and shoulder pain. (Id. ¶ 47.)  She did not return to work until March 2015. (Id. ¶ 48.)  During this time, Benoit continued to receive her MTAPD salary and reimbursement for medical expenses in accordance with MTAPD policy. (Id. ¶ 51.)  In March 2015,

7

Benoit returned to work on restricted duty, making phone calls for the MTAPD. (Id. ¶ 49.)  In June 2015, she returned to full duty after passing a shooting test and receiving medical clearance. (Id. ¶ 50.)

## II.  Applicable Law

### A.  FELA

Under FELA,

> [e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.  A plaintiff asserting a claim under FELA must "prove the traditional common law elements of negligence:  duty, breach, foreseeability, and causation." Tufariello v. Long Island R.R. Co., 458 F.3d 80, 87 (2d Cir. 2006).

A FELA employer has a duty to provide its employees with a reasonably safe place to work. Sinclair v. Long Island R.R., 985 F.2d 74, 76 (2d Cir. 1993).  The employer breaches this duty if it fails to take reasonable steps to investigate and to inform and protect its employees once it knows or should know of a potential hazard. Gallose v. Long Island R.R. Co., 878 F.2d 80, 84-85 (2d Cir. 1989).  Therefore, reasonable foreseeability is

8

the "essential element" in a FELA action because it is only when
an employer knows or should know of a potential hazard (i.e.,
when the potential hazard is reasonably foreseeable) that the
employer's duty arises. <u>Sinclair</u>, 985 F.2d at 77; <u>Gallose</u>, 878
F.2d at 85 ("The catalyst which ignites this duty is knowledge,
either actual or constructive."). FELA's causation standard is
looser than common-law proximate cause because it assigns
liability "if [the railroad's] negligence played a part—no
matter how small—in bringing about the injury." <u>CSX Transp.,</u>
<u>Inc. v. McBride</u>, 564 U.S. 685, 705 (2011) (alteration in
original). In other words, "an employer may be held liable
under FELA for risks that would otherwise be too remote to
support liability at common law." <u>Tufariello</u>, 458 F.3d at 87
(quoting <u>Ulfik v. Metro-N. Commuter R.R.</u>, 77 F.3d 54, 58 (2d
Cir. 1996)).

## B.   Summary Judgment Standard

A court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56. A material fact is a fact that "might affect the outcome
of the suit under the governing law." <u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242, 248 (1986). A genuine dispute exists "where
the evidence is such that a reasonable jury could decide in the
non-movant's favor." <u>Dean v. Univ. at Buffalo Sch. of Med. &</u>

Biomedical Scis., 804 F.3d 178, 186 (2d Cir. 2015) (quoting

Delaney v. Bank. of Am. Corp., 766 F.3d 163, 167 (2d Cir.

2014)). "In moving for summary judgment against a party who will

bear the ultimate burden of proof at trial, the movant's burden

will be satisfied if he can point to an absence of evidence to

support an essential element of the nonmoving party's claim."

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18

(2d Cir. 1995).  A court deciding a motion for summary judgment

must credit the nonmoving party's evidence and draw all

justifiable inferences in the nonmoving party's favor, Curry v.

City of Syracuse, 316 F.3d 324, 329 (2d Cir. 2003), but "the

nonmoving party may not rely on conclusory allegations or

unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express

Corp., 247 F.3d 423, 428 (2d Cir. 2001) (quoting Scotto v.

Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

There is a strong federal policy in favor of letting juries

decide FELA cases. See Sinclair, 985 F.2d at 77; O'Connell v.

Nat'l R.R. Passenger Corp., 922 F.2d 1039, 1042 (2d Cir. 1991)

("It is well-settled that 'the role of the jury is significantly

greater in FELA cases than in common law negligence actions.'

(quoting Eggert v. Norfolk & W. Ry., 538 F.2d 509, 511 (2d Cir.

1976))).  "Congress intended that 'trial by jury is part of the

remedy' under FELA." O'Connell, 922 F.2d at 1042 (quoting Atl. &

Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 360 (1962)).

Congress enacted FELA to achieve a broad remedial purpose
and shift the cost of injury in the railroad industry from the
employee to the employer. See CSX Transp., Inc., 564 U.S. at
691.  To achieve this purpose, "the common-law negligence
standards of foreseeability and causation normally applied in
summary judgment are substantially diluted." Syverson v. Consol.
Rail Corp., 19 F.3d 824, 825 (2d Cir. 1994).  Still,
"[c]laimants must at least offer some evidence that would
support a finding of negligence." O'Hara v. Long Island R.R.
Co., 665 F.2d 8, 9 (2d Cir. 1981) (per curiam).

The U.S. Supreme Court's opinion in Rogers v. Missouri
Pacific Railroad Co., 352 U.S. 500, 506 (1957), established the
standard for evaluating a motion for summary judgment on a FELA
claim:  "Under this statute the test of a jury case is simply
whether the proofs justify with reason the conclusion that
employer negligence played any part, even the slightest, in
producing the injury or death for which damages are sought."
The Rogers Court explained that "[i]t does not matter that, from
the evidence, the jury may also with reason, on grounds of
probability, attribute the result to other causes, including the
employee's contributory negligence." Id.

### III.  Discussion

Benoit alleges that the MTA acted negligently in ten different ways:  (1) the MTA failed to exercise due care and diligence; (2) the MTA failed to provide Benoit with a safe place to work and safe equipment with which to work; (3) the MTA failed to assign Benoit adequate support for the performance of her duties; (4) the MTA failed to take action when it was known to the defendant that Benoit's partner failed to provide adequate back-up on prior occasions; (5) the MTA failed to train Benjamin and/or other MTA police personnel; (6) the MTA failed to supervise Benjamin; (7) the MTA failed to provide Benoit with proper tools and equipment; (8) the MTA failed to warn Benoit of the existence of the dangers involved; (9) the MTA's employees failed to take proper precautions to prevent Benoit's injuries; and (10) the MTA failed to promulgate and enforce proper and safe rules for the safe conduct of the work operation of the railroad. (Compl. ¶ 10.)

The MTA argues that Benoit cannot show that it acted negligently because Mendez's behavior on September 13, 2014, was not reasonably foreseeable, it had no notice of Benjamin's reputation for failing to back up his partners, and Benoit's remaining allegations are unsupported by the record.  Besides, the MTA argues, Benoit's claims are barred by New York's firefighter's rule and it is immune from suit with regards to

both its discretionary policing actions and Benjamin's

discretionary decisions while attempting to arrest Mendez.

> A.   Benoit Abandoned Several Theories of Negligence in Her
>      Opposition to the MTA's Motion for Summary Judgment

Several of Benoit's theories of negligence can be dismissed

at the outset because they are entirely conclusory or were

abandoned.  First, Benoit's allegations that the MTA "fail[ed]

to exercise due care and diligence" and "fail[ed] to provide

plaintiff with a safe place to work," (Compl. ¶ 10), are simply

restatements of FELA's negligence standard, which, if

unsupported by the facts encompassed by the remaining

allegations, would not survive summary judgment on their own.

See Fujitsu Ltd., 247 F.3d at 428.  Second, Benoit makes no

argument in opposition to summary judgment that there are facts

in the record to support her theories that the MTA "fail[ed] to

provide plaintiff with . . . safe equipment with which to work"

and "fail[ed] to provide the plaintiff with the proper tools and

equipment." (Compl. ¶ 10. See generally Opp'n.)  Benoit's

counsel also conceded that "the evidence did not support that

particular claim" at oral argument. (Oral Arg. Tr. 10:24-11:7,

Sept. 14, 2016, ECF No. 30.)  Finally, Benoit made no argument

in her opposition to summary judgment in support of her theories

that the MTA failed to warn her of the existence of the dangers

involved in policing, that the MTA's employees failed to take

proper precautions to prevent Benoit's injuries, or that the MTA failed to promulgate and enforce proper and safe rules for the safe conduct of the work operation of the railroad.  The Court infers from Benoit's failure to address these allegations at all that she abandoned them. See Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, (2d Cir. 2016) ("'[G]enerally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others,' and 'a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.'" (quoting Jackson v. Fed. Express, 766 F.3d 189, 196, 198 (2d Cir. 2014))).  Accordingly, the MTA's motion for summary judgment with regards to these allegations is granted.

Benoit's remaining allegations of the MTA's negligence can be divided into three theories of negligence, as her counsel noted at oral argument, as follows:  (1) the MTA partnered Benoit with Benjamin despite his reputation for failing to assist his partner; (2) the MTA failed to adequately train its MTAPD officers; and (3) the MTA failed to adequately staff Atlantic Terminal. (See Oral Arg. Tr. 16:17-17:4.)

In its motion for summary judgment, the MTA tilts at a windmill by arguing that it could not have known that Mendez posed a danger to Benoit. (See (Def. MTA's Mem. of L. in Support

of its Mot. for Summ. J. 8, ECF No. 18 [hereinafter Mem.].)
Benoit does not identify the danger posed by Mendez as a
potential hazard.  Rather, she alleges that Benjamin's
reputation for failing to assist his partners, the MTA's
inadequate training, and the MTA's inadequate staffing were the
potential hazards that placed her at risk when performing her
normal job responsibilities, which the MTA admits included
ejecting potentially combative loiterers like Mendez. (See
Def.'s Loc. R. 56.1 Statement ¶¶ 10, 12 (stating that Benoit's
job required her to "[s]ubdue persons resisting arrest during a
violent rage" and "included removing people who did not belong
there, such as members of the homeless population who often
linger in the terminal"); Oral Arg. Tr. 3:16-4:17; 7:12-15
(conceding that the MTA knew that homeless people loitered in
Atlantic Terminal and that Benoit also "knew that she would be
ejecting homeless people from various places.").)[6]  Focusing on

---

[6] The Second Circuit has rejected the MTA's narrow construction
of what is a reasonably foreseeable potential hazard in FELA
actions.  In Gallose, 878 F.2d at 82, for example, a railroad
employee brought a dog to work for protection and the dog bit a
railroad police officer.  The district judge charged the jury
that, in order to be found liable, the railroad must have known
that the dog had vicious propensities. Id. at 85.  The Second
Circuit reversed the judgment for the railroad, holding that the
appropriate question was whether the railroad knew or should
have known that there was a large dog on the premises and, "if
so, whether an employer using reasonable care should have
investigated further or taken other steps to inform and protect
its employees." Id.  Likewise, the appropriate question here
would be not whether the MTA knew or should have known that

15

the combative loiterers as potential hazards would recast the
potential hazards that Benoit does allege (i.e., Benjamin's
reputation for failing to assist his partners, inadequate
training of MTAPD, and inadequate staffing at Atlantic Terminal)
as elements of reasonable (or unreasonable) steps that the MTA
could have taken in response to the hazard of combative
loiterers.  This is not how Benoit frames her claim of
negligence under FELA.  And, although the MTA addresses this
potential additional hazard, it does not argue that the
potential hazards that Benoit identifies are not hazards at all.
Accordingly, the Court turns to Benoit's theories of liability
as alleged, which assert that the MTA knew or should have known
of three potential hazards:  (1) Benjamin's alleged reputation
for failing to adequately assist his partners, (2) inadequate
training of its personnel, and (3) inadequate staffing of
Atlantic Terminal.

> B.   A Genuine Dispute Exists As to Whether
> Partnering Benoit with Benjamin Was a Reasonably
> Foreseeable Potential Hazard

The MTA argues that it had no knowledge of Benjamin's
alleged reputation for failing to assist his partners because

---

Mendez would act belligerently and resist arrest, but rather
whether the MTA knew or should have known that potentially
combative loiterers lingered at Atlantic Terminal.

Benoit never formally complained and there is no evidence of any other complaints in his personnel file. (Mem. 8-9.)

In her opposition to the MTA's motion for summary judgment, Benoit points to two statements in her deposition testimony to show that there is a genuine dispute about the MTA's actual or constructive knowledge. First, Benoit testified that "it was 'widely known throughout the Department that Officer Benjamin would fail to step up to aid a partner in trouble'" and, second, she named "at least one supervisor with personal knowledge of this tendency."[7] (See Opp'n 8 (citing Benoit Dep. 41:10-44:17, Mar. 3, 2016, ECF No. 24-3; Benoit Aff. in Opp'n to Mot. for Summ. J., ECF No. 22).)

Benoit did not identify these facts in her Local Rule 56.1 Statement, and the Court could choose not to ignore such a procedural defect. See Fed. R. Civ. P. 56(c)(3); Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001). But, in an effort to best determine the propriety of granting summary judgment and because the MTA does not object on these procedural grounds, (see Mem. of L. in Further Support of Def. MTA's Mot. for Summ. J. 4, ECF No. 25 [hereinafter Reply]), the Court considers Benoit's testimony about Benjamin's reputation.

---

[7] According to Benoit's testimony, the "supervisor" was a fellow officer named Meyers, who was later promoted to sergeant. (Benoit Dep. 44:10-13.)

The MTA objects to Benoit's testimony on evidentiary grounds.  Without further explanation, the MTA characterizes Benoit's testimony about Benjamin's reputation as inadmissible hearsay. (Id.)  At oral argument, the MTA clarified its position that Benoit's testimony addresses "what some other sergeant might have known." (Oral Arg. Tr. 5:18-19.)

Benoit's testimony about Benjamin's reputation is excepted from the rule against hearsay.  Her identification of a fellow officer with personal knowledge of Benjamin's reputation is hearsay, but shows that facts exist that may be proved by competent evidence at trial sufficient to survive summary judgment.

Federal Rule of Evidence 801(c) defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Both of Benoit's statements are hearsay, because the declarants—other officers—have not testified on the record now before the Court and Benoit offers these statements to prove that it is true that Benjamin has a reputation for failing to assist his partners.  The significance of these statements does not "lie[] solely in the fact that [they were] made," Fed. R. Evid. 801 advisory committee's note to 1972 proposed rule, because the statements are only

significant if they substantiate Benjamin's true reputation in the MTAPD. <u>See</u> <u>U.S. v. Harris</u>, No. S1 92 Cr. 455(CSH), 1992 WL 373473, at *1 (S.D.N.Y. Dec. 2, 1992).

Benoit's statement that "it was 'widely known throughout the Department that Officer Benjamin would fail to step up to aid a partner in trouble,'" (Opp'n 8 (quoting Benoit Aff. ¶ 10)), is excepted from the rule against hearsay under Federal Rule of Evidence 803(21).  That subsection states that the rule against hearsay does not exclude evidence of "[a] reputation among a person's associates or in the community concerning the person's character." Fed. R. Evid. 803(21).  For character evidence to be competent, "[i]t is well established that a character witness must be able to demonstrate his own familiarity with the defendant's reputation and his competence to speak for the community." <u>United States v. Perry</u>, 643 F.2d 38, 52 (2d Cir. 1981) (citing <u>Michelson v. United States</u>, 335 U.S. 469, 478 (1948)).  In <u>Michelson</u>, 335 U.S. at 478, (a decision issued prior to the promulgation of the Federal Rules of Evidence), the Supreme Court held "the witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded."  There is no serious question that Benoit—Benjamin's partner and a member of the

MTAPD for fourteen years at the time of the incident—is qualified to give an opinion of Benjamin's reputation in the MTAPD, and the MTA has not challenged her qualification.  While Benoit certainly has an interest in portraying Benjamin's reputation negatively, such a credibility determination is the jury's province.

Benoit's statement that attributes knowledge of Benjamin's reputation to a fellow officer, (see Opp'n 8 (citing Benoit Dep. 41:10-44:17)), is hearsay without an exception.  But Benoit does not need to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Celotex v. Catrett, 477 U.S. 317, 324 (1986).  Rather, she must show that facts exist that "may be proved by competent evidence at trial that would allow a reasonable jury to return a verdict in [her] favor." Murphy v. Metro. Transp. Auth., 548 F. Supp. 2d 29, 42 (S.D.N.Y. 2008).  Identifying a fellow officer with personal knowledge of Benjamin's reputation is sufficient at this stage because Benoit appears able to subpoena this witness to testify at trial. Id. at 43-44 (citing Watts v. City of Hartford, No. 3:00CV0681(RNC), 2004 WL 717132, at *4 n.10 (D. Conn. Mar. 31, 2004) ("Plaintiff presumably could identify and subpoena police department personnel with personal knowledge of the matters discussed in the [hersay]")).

Benoit has identified evidence sufficient under FELA's relaxed standards to present a jury question with regards to whether the MTA exercised reasonable care to protect Benoit from the potential hazard of partnering her with Benjamin, because there is a genuine dispute as to whether it should have known of his reputation for failing to assist his partners.

The MTA also argues that there is no evidence in the record that Benjamin failed to assist Benoit with Mendez's arrest, because "Benjamin was physically involved in arresting Mendez" when he "'took [Mendez] and slammed him up against a wall' and held Mendez's left arm while Benoit handcuffed Mendez's right arm." (Mem. 8 (alteration in original) (quoting Def.'s Loc. R. 56.1 Statement ¶ 30).)  The MTA points also to Benoit's statements in contemporaneous reports that "we"—meaning, the MTA argues, herself and Benjamin—handcuffed Mendez and that both officers used force to subdue Mendez. (Id. at 8-9.)  Benoit disputes that Benjamin assisted in the arrest, and she disputes that Benjamin joined her in handcuffing Mendez, citing to her deposition testimony:  "Q.  Who actually handcuffed Mendez?  Was that you?  Officer Benjamin?  A.  I handcuffed him initially, and when I brought the arm back, I cuffed him completely." (Benoit Dep. 53:23-54:1; accord Pl.'s Loc. R. 56.1 Statement ¶ 67.)  She asserts that Benjamin's failure to act after slamming Mendez against the wall emboldened Mendez's resistance

21

and left her no option other than to tackle Mendez to the ground
to complete the arrest, resulting in her injuries. (Pl.'s Loc.
R. 56.1 Statement ¶¶ 64, 66.)  Although the MTA is correct that
there is no dispute that Benjamin was physically present and
participated in the altercation with Mendez, the parties dispute
whether he assisted her in the arrest.  This is a material fact
and the parties' dispute over it should be resolved by the jury.

<u>C.</u>  <u>No Genuine Dispute As to a Material Fact Exists
Regarding the MTA's Training of Its Personnel
or the Staffing of Atlantic Terminal</u>

By contrast, even under FELA, Benoit has not pointed to any
evidence in the record to demonstrate a genuine dispute as to a
material fact regarding the MTA's training of its officers or
the staffing of Atlantic Terminal.

Benoit's contention that the MTA failed to adequately train
its officers is supported only by her testimony that "MTA
officers needed more hands-on training in dealing with violent
individuals since the computer or video training offered was not
as helpful as hands-on training." (Pl.'s Loc. R. 56.1 Statement
¶ 71 (citing Benoit Dep. 12:19-13:8).)  Similarly, Benoit's
contention that the Atlantic Terminal was understaffed is
supported only by her testimony that "[f]or years defendant had
known the Atlantic Terminal was understaffed." (<u>Id.</u> ¶ 69 (citing
Benoit Dep. 79:25-81:21; Benoit Aff. ¶ 11).)

22

Benoit's personal opinions are unsupported by any factual evidence demonstrating staffing or training inadequacies. Moreover, even if the Court accepted the accuracy of her opinions, she cannot point to any evidence in the record that would justify the conclusion that the MTA knew—actually or constructively—of its alleged staffing and training inadequacies.  Because Benoit cannot identify any evidence beyond her own conclusory allegations and unsubstantiated speculation that the Defendant knew or should have known of staffing inadequacies at Atlantic Terminal and inadequate training of its personnel, the MTA's motion for summary judgment with regards to those claims is granted.

### D.  Neither the Firefighter's Rule nor the Governmental Function Defense Apply Here

The MTA argues that, even if Benoit has established a prima facie claim of negligence under FELA, it is entitled to summary judgment because the firefighter's rule and the governmental function defense bar Benoit's claim as a matter of law.  The MTA has failed to show that either defense applies here.

### 1.  The MTA Has Not Shown That the Firefighter's Rule Should Apply Under FELA

The MTA argues that the firefighter's rule, which includes police officers, applies to bar Benoit's claim because Congress did not intend FELA to address injuries caused by the dangers of policing and because FELA did not abrogate the firefighter's

rule. (Mem. 15-18.)  The MTA has failed to show that the
firefighter's rule is applicable under FELA.

In <u>Santangelo v. State</u>, 71 N.Y.2d 393, 396 (1988),
<u>superseded by statute</u>, N.Y. Gen. Mun. Law § 205-e,[8] the New York
Court of Appeals described the "long-standing common-law rule"
known as the "firefighter's rule" as follows:  "firefighters
injured while extinguishing fires generally cannot recover
against the property owners or occupants whose negligence in
maintaining the premises occasioned the fires."  The <u>Santangelo</u>
court explained that premises liability originally provided the
rationale supporting the firefighter's rule:  because
firefighter's were no more than licensees, they took the
property as they found it. <u>Id.</u> at 396-97.  This rationale later
gave way to assumption of risk:  firefighters assume the risks
of fire-related injuries including the risk of property owners
and occupants negligently maintaining their premises. <u>Id.</u> at
397.  A public policy argument also supports the rule:
Municipalities already compensate firefighters for the risks
inherent in fighting fires through certain benefits like

---

[8]  To keep this discussion manageable, the Court cites <u>Santangelo</u>
as representative of the common law firefighter's rule in
American jurisdictions.  The contours of the rule vary across
these jurisdictions (and some jurisdictions have abolished it
altogether).  Because the Court finds the rule to be
inapplicable, however, the details of any distinctions among
jurisdictions are irrelevant here.

workers' compensation, retirement and pension programs, and so forth.  It would be too burdensome to permit firefighters to also recover for injuries caused by the inherent risks of their profession given the compensation already provided to them. Id. The Santangelo court concluded that the same policy considerations supported barring police officer's recovery because, like firefighters, "police are the experts engaged, trained and compensated by the public to deal on its behalf with emergencies and hazards often created by negligence, and like firefighters they generally cannot recover damages for negligence in the very situations that create the occasion for their services." Id.  The court added that police officers "receive both training that enables them to minimize the dangers their occupation requires them to face, and compensation and special benefits to help assure that the public will bear the costs of injuries suffered by its protectors in the line of duty." Id. at 397-98.

When Congress enacted FELA, it abolished several common law tort defenses with the aim of furthering FELA's humanitarian purposes. See Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542-43 (1994).  Specifically, Congress eliminated the fellow servant rule, selected a comparative negligence scheme over the defense of contributory negligence, and prohibited contractual exemptions from FELA for employers. See id.; see also 45 U.S.C.

§§ 51, 53, 55.  By later amendment, Congress also eliminated the
assumption of risk defense.  See Gottshall, 512 U.S. at 543; see
also 45 U.S.C. § 54.  FELA is silent with regards to the
firefighter's rule.  Under these circumstances, the Supreme
Court directs courts to look first at FELA itself, its purposes
and background, and how courts have construed it over time.  See
Gottshall, 512 U.S. at 541.  Second, courts must consider how
the common law viewed the right or defense because "FELA
jurisprudence gleans guidance from common-law developments."  Id.
(quoting Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S.
557, 568 (1987)).  At this second step, common law principles
are not dispositive of questions arising under FELA, but "unless
they are expressly rejected in the text of the statute, they are
entitled to great weight" in the analysis.  Id. at 544.

The MTA argues that FELA is directed to the physical
dangers of railroading and, when "a police officer's injury is
not related to that specific risk, and only relates to the
primary risk of police work, FELA affords no relief." (Mem. 17-
18.)  Looking first at FELA itself, the statute applies to "any
person suffering injury while he is employed by" a common
carrier engaging in interstate commerce and the statute directs
that a person shall be considered employed by a common carrier
if "any part of [her] duties as such employee shall be [in] the
furtherance of interstate or foreign commerce; or shall, in any

26

way directly or closely and substantially, affect such commerce as above set forth." 45 U.S.C § 51.  Courts applying FELA have held it to cover file clerks, assistant chief time keepers, messenger boys, and lumber inspectors because the benefits of the Act are not limited to those "exposed to the special hazards of the railroad industry." Reed v. Pa. R.R. Co., 351 U.S. 502, 505-06 (1956) (collecting cases); accord Greene v. Long Island R.R. Co., 280 F.3d 224, 229-30 (2d Cir. 2002).  Courts in this circuit have repeatedly permitted police officers to recover under FELA for injuries not directly incident to railroading. See, e.g., DeRienzo v. Metro. Trans. Auth., 237 F. App'x 642 (2d Cir. 2007) (police officer slip on stairwell debris); Greene, 308 F.3d 224 (police officer injured in vehicular accident); Gallose, 878 F.2d 80 (police officer bitten by a dog); Parente v. Metro. Transp. Auth., No. 10 Civ. 5913(LTS)(DCF), 2012 WL 1813077 (S.D.N.Y. May 16, 2012) (police officer slip on ice). Therefore, FELA's text and the courts' construal of it do not support the MTA's contention that FELA affords no relief to railroad employees hired to police railroad stations.

Additionally, the rationales supporting the firefighter's rule do not support extending the rule to claims brought under FELA.  First, FELA's text expressly rejects assumption of risk. See 45 U.S.C. § 54; Tiller v. Atl. Coast Line R. Co., 318 U.S. 54, 67 (1943) ("[A]ssumption of risk, must not, contrary to the

will of Congress, be allowed recrudescence under any other label
in the common law lexicon.").  Second, FELA's text addresses the
public policy concern that allowing recovery for injuries caused
by inherent risks in addition to already existing specialized
compensation is too burdensome on the public fisc.  (This
concern is admittedly not shared by all railroad employers
liable under FELA, but may apply to public benefit corporations
like the MTA.)  While FELA forbids an employer from exempting
itself from liability through contract, it does permit an
employer to "set off [in an action against it] any sum it has
contributed or paid to any insurance, relief benefit, or
indemnity that may have been paid to the injured employee." 45
U.S.C. § 55.  This setoff addresses the public policy concern
behind the firefighter's rule.  Finally, FELA does not address
the premises liability rationale at one time seen as supporting
the firefighter's rule.  To the extent that this rationale
persists, the common law views employees not as licensees who
take the land as it is, but as invitees to whom the owner or
occupant owes a duty. See Restatement (Second) of Torts § 332 &
cmt. j (1979).  As such, the premises liability rationale is
inapplicable to railroad employees who police railroad stations.

      FELA's text, its purposes and background, courts' construal
of its text, and the common law all support permitting recovery
for a railroad employee police officer injured by his employer's

negligence.  Consequently, the MTA has failed to show that the
firefighter's rule is applicable to Benoit's FELA claim.

### 2.  The MTA Has Not Shown that It Exercised Discretion in Partnering Benoit With Benjamin After Learning of His Reputation for Failing to Assist His Partners

The MTA argues that its negligence is shielded from
liability by the governmental function defense.  This defense
absolves public entities from liability for negligence when the
allegedly negligent act was the exercise of reasonable
discretion related to a legislative, judicial, or administrative
function. See generally id. § 895C.  The MTA's argument that the
governmental function defense applies here thrusts mainly at
Benoit's theory that the MTA failed to provide a reasonably safe
workplace because of staffing inadequacies.  Because Benoit has
failed to point to evidence that a genuine dispute as to a
material fact exists with regards to this theory, the Court need
not consider whether the governmental function defense would
absolve the MTA from liability if it staffed Atlantic Terminal
negligently.

The MTA also argues that Benjamin's "method of assistance"—
i.e., his decision not use his baton or mace on Mendez—falls
within the governmental function defense (or, more accurately,
New York's derivative "professional judgment rule," which
"insulates a municipality from liability for its employees'

29

performance of their duties 'where the . . . conduct involves
the exercise of professional judgment such as electing one among
many acceptable methods of carrying out tasks, or making
tactical decisions,'" Johnson v. City of New York, 15 N.Y.3d
676, 680 (2010) (alteration in original) (quoting McCormack v.
City of New York, 80 N.Y.2d 808, 811 (1992)). See generally
Restatement (Second) of Torts § 895C cmt. h ("[A] government
officer is entitled to the professional's exercise of reasonable
discretion, and liability does not depend on the correctness of
the judgment if it was reasonable.").) (See Mem. 14-15.)  This
argument misunderstands Benoit's theory of the MTA's liability.

As noted above, and by Benoit's counsel at oral argument,
Benoit does not argue that Benjamin's failure to use his baton
or mace caused her injuries.  Instead, she argues that the MTA
acted negligently when it partnered her with Benjamin when it
knew or should have known that Benjamin would fail to assist her
in making an arrest. (See Oral Arg. Tr. 16:2-4 (arguing that
Benoit's "escalation to mace and a baton might have been avoided
had [Benjamin] simply been on the spot and on the job and aiding
his partner").)  The professional judgment rule does not apply
to this theory.

The governmental function defense might still apply to
Benoit's theory of the MTA's liability, however.  Although not
explicit in its briefing, the MTA's argument that its staffing

decisions are nonjusticiable could be read to include its decision to partner Benoit with Benjamin.  Even so, that argument fails.  Like the firefighter's rule, FELA is silent with regards to the governmental function defense.  The Court need not determine whether the governmental function defense is applicable under FELA, however, because even if it is the MTA has not identified any evidence that it exercised discretion in partnering Benoit with Benjamin after learning of his reputation for failing to assist his partners.  On the contrary, the MTA's position has been that it did not know of Benjamin's reputation. (See Mem. 8-9; Reply 4.)

The New York Court of Appeals' decision in Haddock v. City of New York, 75 N.Y.2d 478 (1990), is illustrative.  In Haddock, the plaintiff sued the City for negligent retention of an employee after a Parks Department employee who had a criminal history including attempted rape, James Johnson, raped her.  At his interview for the Parks Department, Johnson lied to the City and said he had no arrest record. Id. at 481-82.  Several months after he was hired, however, the City received a "rap sheet" reflecting a substantial criminal past including a conviction for attempted rape. Id. at 482.  The trial court set aside a verdict in favor of the plaintiff and dismissed the complaint because it held that the hiring and retention of the employee were discretionary governmental acts. Id. at 483.  The Appellate

Division reversed and reinstated the verdict, which the Court of Appeals affirmed because the City could not show that "it made a judgment of any sort when it learned that Johnson both had a criminal record and lied egregiously about it." Id. at 485. To the Court of Appeals, the "key fact" was "that no City employee in the relevant time frame weighed the impact of Johnson's record on his work assignment or made a judgment that he should be retained." Id.

Like the City in Haddock, the MTA has not shown that any employee considered Benjamin's reputation for failing to assist his partners prior to partnering Benjamin with Benoit. Indeed, the MTA's position at summary judgment, as discussed above, is that Benjamin has no such reputation and that, if he did, the MTA had no knowledge of it. Because the MTA cannot show that it exercised discretion in partnering Benoit with Benjamin after learning of his reputation for failing to assist his partners, the governmental function defense, even if it applies to FELA claims, does not apply here.

**Conclusion**

Benoit's theories that the MTA failed to provide a reasonably safe workplace because it failed to exercise due care and diligence and failed to provide Benoit with a safe place to work are entirely conclusory.  The Court grants MTA's motion for summary judgment as to these theories.

Based on Benoit's failure to address in her opposition to summary judgment her theories of liability that the MTA failed to provide her with a reasonably safe workplace by failing to provide her with safe equipment, failing to warn her of the existence of the dangers of policing, failing to promulgate and enforce proper and safe rules for the safe conduct of the work operation of the railroad, and its employees failing to take proper precautions to prevent Benoit's injuries, the Court infers that Benoit has abandoned these theories of liability and grants the MTA's motion for summary judgment as to these theories of liability.

No genuine dispute exists as to the material facts of the MTA's training of its officers or its staffing of Atlantic Terminal.  The Court grants the MTA's motion for summary judgment as to these theories of liability.

A genuine dispute exists as to the material fact of Benjamin's reputation for failing to assist his partners, and Benoit has identified evidence in a form that would be

admissible at trial such that summary judgment is inappropriate on her theory that the MTA failed to provide her with a reasonably safe workplace under FELA by partnering her with Benjamin.  The MTA has failed to establish that either the firefighter's rule or the governmental function defense applies to bar Benoit's recovery here.  Therefore, the Court denies the MTA's motion for summary judgment as to Benoit's theory of liability that the MTA failed to provide her with a reasonably safe workplace under FELA by partnering her with Benjamin when it knew or should have known of his reputation for failing to assist his partners.

A final pretrial conference is scheduled for Wednesday, December 21, 2016, at 11:00 a.m. in Courtroom 20C, at which time a firm trial date will be set for a time shortly following the conference.

**SO ORDERED.**

Dated:      New York, New York
            November 21, 2016

                                John F. Keenan
                                United States District Judge